**PARAMOUNT PICTURES CORP.,**

v.

**John DAVIS.**

No. Civ.A. 05–0316.

United States District Court, E.D. Pennsylvania.

Dec. 2, 2005.

---

Alexandra N. Deneve, Loeb & Loeb LLP, New York, NY, Cheryl A. Krause, Paul W. Kaufman, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Paramount Pictures Corp.

John Davis, Philadelphia, PA, pro se.

*MEMORANDUM*

O'NEILL, District Judge.

Plaintiff, Paramount Pictures Corp., filed a John Doe complaint on January 21, 2005 under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., claiming that defendant, later identified as John Davis, pro se, violated its exclusive rights to reproduce and distribute plaintiff's motion picture, "Lemony Snicket's: A Series of Unfortunate Events," by willfully and knowingly obtaining an illegal digital copy of the motion picture and making the motion picture available for digital distribution via an internet distribution system named eDonkey one week after the motion picture's theatrical release date. Plaintiff seeks a permanent injunction precluding defendant from infringing upon its motion picture copyrights under 17 U.S.C. § 502(a), $50,000 in statutory damages under 17 U.S.C. § 504(c), and $38,437.68 in attorneys' fees and costs under 17 U.S.C. § 505. Neither party has requested a jury trial. Before me now are the parties' cross motions for summary judgment.

## BACKGROUND

### I.   The Internet

Prior to discussing the specific facts of this case, I find it necessary to place this case in the technological context. The internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows hundreds of millions of people around the world to exchange ideas and information freely and easily. For example, users of the internet freely exchange academic research, literary works, financial data, music, audiovisual works, graphics, and other digital data. With the aid of other technological developments, the internet also has afforded users with opportunities to infringe on the rights of owners of copyrighted works, including motion pictures. Given the open and digital nature of the internet, once a motion picture has been transformed into an unsecured digital format, it can be copied further and distributed an unlimited number of times over the internet without degradation in picture or sound quality.

### A.   P2P Networks

Many individuals seeking to copy and distribute copyrighted motion pictures over the internet use online media distribution systems called "peer-to-peer" ("P2P") networks. P2P networks, in their most common form, are computer systems that enable internet users to make files stored on each user's computer available for copying by other users, to search for files stored on other users' computers, and to transfer exact copies of files from one computer to another via the internet. Although P2P networks allow the copying and transfer of many different types of digital files, I focus my discussion on copyrighted motion pictures at issue in this case. Here, Paramount has never authorized any of its motion pictures to be distributed via P2P networks.

### B.   First Propagator

For any one copy of a motion picture to be made available without authorization of a copyright owner on a P2P network, there must be a "first propagator" (also known as an "early propagator" or a "first mover") of that copy of that motion picture. A first propagator is the particular P2P user who is the first to obtain (via some means) an illegal digital copy of a motion picture. He or she then places that copy in a publicly shared directory that he makes available to the P2P users around the world over the internet. But for the infringing acts by a first propagator, an infringing copy of a motion picture would never appear on P2P networks and the chain of infringing copies would never commence. All means of obtaining a digital file of a motion picture without authorization of the copyright owner are illegal. One method of obtaining such a file is to sneak a camcorder into the movie theater after an opening weekend and illegally film the motion picture. Once the recording of the motion picture is converted into a digital film, it can be distributed on the internet.

The motion picture industry (along with the recording industry and other producers and distributers of copyrighted media) takes particular offense to the activities of first propagators because their ability to obtain

and offer an illegal digital copy of a motion picture on a public P2P network for widespread unauthorized copying and distribution sets off a chain reaction that enables millions of people to copy and further distribute that motion picture to others. Paramount claims that such activity damages the value of their copyrights, particularly when the first propagator distributes the motion picture on a P2P network while the motion picture is still in the theatrical release stage of distribution and has not yet reached the home video (DVD and VHS) stage of distribution. Paramount claims that such illegal distribution can severely diminish or destroy the profitability of the motion picture because the revenue from the theatrical and home video releases are necessary to recover a motion picture's substantial production and marketing costs.

## C. BayTSP

In an effort to combat such activities, Paramount hired BayTSP, an antipiracy technology specialist, to identify direct infringers and first propagators of its motion pictures over P2P networks. BayTSP has developed a specific technology platform to detect unauthorized distribution of digital motion pictures (and other digital content) over several P2P networks, including eDonkey. BayTSP also has developed a method to identify first propagators of specific digital content on the eDonkey network (and other P2P networks). Paramount provides BayTSP with lists of copyrighted motion pictures it believes may be the subject of infringing activity, particularly those motion pictures that are about to begin their theatrical release.

To determine whether certain specific motion pictures are being offered on the eDonkey network, BayTSP connects to the network and searches for users who are offering copies of the motion picture. BayTSP uses the same basic technical processes that are used by eDonkey users to identify users who are making Paramount's motion pictures available over the internet. Once BayTSP locates an eDonkey network user who is offering for download a specific motion picture, a BayTSP employee downloads the motion picture file and executes an evidence gathering software program that obtains the Internet Protocol address of that user while the motion picture is downloading.

An IP address is a unique numerical identifier that is automatically assigned to a user by its Internet Service Provider each time a user logs on to the network. Although a subscriber may be assigned a different IP address each time he or she logs on, ISPs are assigned certain blocks or ranges of IP addresses and ISPs keep track of the IP addresses assigned to its subscribers at any given moment and retain user logs of their activity. Therefore, if provided with a user's IP address and the date and time of the infringing activity, an ISP can use its user logs to identify the name and address of the ISP subscriber who was assigned that IP address at that date and time.

In addition to the motion picture file and IP address, BayTSP simultaneously downloads other publicly available identifying information from the network user. For example, BayTSP downloads and records for each file downloaded from each user: (a) the video file's metadata (digital data about the file), such as its title and file size, which is not part of the actual video content but that is attached to the digital file and helps identify the content of the file; (b) the time and date at which the file was downloaded from the user; (c) the IP address assigned to each user at the time of activity; and (d) the percentage of the file the eDonkey user is offering on his or her computer. BayTSP then creates evidence logs for each user and stores this information. Paramount then confirms that the file downloaded is in fact one of its motion pictures.

Digital copies of motion pictures are very large computer files and take anywhere from several hours to several days to download from one network user to another. In order to speed up this process, eDonkey software (provided free of charge to network users) enables a user to obtain a particular copy of a motion picture from many different users. When a user searches for a particular motion picture, the eDonkey network finds many different people who have a copy or portions of a copy of that motion picture on their shared directory and enables the user to

download different pieces of the motion picture from more than one user. Downloading the motion picture in different pieces from different sources increases the likelihood that the user will obtain the whole motion picture file and decreases that period of time necessary to download the entire file. Once a user obtains a portion of a motion picture file, that portion of that motion picture becomes available for download by another user.

When a first propagator makes a complete copy of a motion picture file available on eDonkey by placing it in a special shared folder on his or her computer, the eDonkey software automatically assigns a unique Hash Identifier or number to that file, which is how that file and portions thereof are identified within the network. The hash identifier is a binary number eighty characters long. Therefore, the probability of two files sharing the same hash number is $2^{80}$, i.e. more than one septillion (one followed by twenty four zeros) to 1. The probability of two files sharing the same hash number and the same file size is even smaller. Any eDonkey user who holds a portion of a file with the same hash number as the hash number assigned to the first propagator's complete file obtained that file (either directly or indirectly) from the first propagator.

To find a first propagator of a motion picture on the eDonkey network, BayTSP makes a constant search of the network until it finds the first instance of a particular digital copy of a motion picture identified by a specific hash number. There are two key characteristics to BayTSP's search that allow BayTSP to confirm its determination that a user is a first propagator of a specific digital copy of a motion picture on the eDonkey network. First, BayTSP's constant search for a particular title on the eDonkey network begins before the motion picture is released in theaters. This ensures that BayTSP will find the digital copy at the precise time or within a short time after the first propagator makes the pirated motion picture available on the network. Second, BayTSP determines the percentage of the total file a user

holds when detected by the system. This ensures that the user identified as the first propagator has the entire file available for download. If a particular user is both the first in time to appear on the network with a unique copy (identified by a unique hash number) of the motion picture and appears on the network with the complete digital file, then that user is the first propagator and was the first person to place that copy of the motion picture on the P2P network. If a user were shown to be offering less than the complete motion picture, then that user would still be downloading the motion picture from another user, who would therefore not be a first propagator.

## II.   John Davis

Prior to the motion picture's theatrical release on December 17, 2004, Paramount instructed BayTSP to search the eDonkey network for the motion picture and identify first propagators of the motion picture on the eDonkey network. The motion picture was one of Paramount's 2004 December holiday releases. It cost more than $120 million to produce.

## A.   Finding the Infringer

Using the method described above, BayTSP began searching for the motion picture on eDonkey in early December 2004. On December 23, 2004 at 04:49:52 PM Eastern Standard Time,[1] BayTSP located an eDonkey user offering for download 100% of a file labeled "lemony snickets 'jim carey'.mpg" with the IP address 69.141.202.170. BayTSP downloaded segments of the digital file, saved the relevant identifying information described above, and created an evidence log for this infringer. BayTSP also concluded that this infringer was a first propagator because he or she was the first to offer a digital copy of the motion picture with a unique hash identifier not previously assigned to other files on the eDonkey network and he or she offered for download a file that had 100% of the picture. Paramount claims that this evidence collected and prepared by

---

**1.**  Confusingly, Paramount asserts a different time of infringing activity (11:49:52 AM Eastern Standard Time) in its motion for summary judgment. For the sake of simplicity, I will use the time asserted in Paramount's complaint.

BayTSP proves that this individual was infringing on Paramount's copyright and was a first propagator. Paramount later confirmed that this file was its motion picture.

## B. Identifying John Davis

Based on the infringer's IP address, BayTSP determined that Comcast Cable Communications was the infringer's ISP. In order to identify this infringer, Paramount filed a John Doe lawsuit in this Court on January 21, 2005 against the infringer because Comcast resides in this District. Paramount simultaneously filed a motion to serve discovery prior to the Rule 26(f) conference seeking leave from the Court to serve Comcast with a subpoena for the infringer's true identity by use of the IP address and date and time of infringement. My deceased colleague, Judge Kelly granted this motion, and on March 3, 2005, Paramount served Comcast with the subpoena. Before responding to the subpoena, Comcast informed the infringer (its subscriber) in writing on March 9, 2005 of the lawsuit against him and its intention to respond to the subpoena by revealing his identity.

After checking its subscriber logs and notifying Davis of the lawsuit and subpoena, Comcast identified Davis as the suspected infringer on March 30, 2005. On May 26, 2005, Paramount filed an amended complaint naming Davis as the John Doe defendant. Davis was served with the complaint and summons on June 2, 2005.

## C. Answer by John Davis

Davis filed an answer to the complaint on July 27, 2005. In his answer, Davis parrots the language of Paragraphs Four and Five of plaintiff's complaint:

4. Plaintiff Paramount is among the world's leading creators and distributors of motion pictures. Paramount is a Delaware corporation, with its principal place of business at 5555 Melrose Avenue, Los Angeles, California. Paramount is engaged in the production, acquisition and distribution of motion pictures for theatrical exhibition, home entertainment and other forms of distribution. Paramount is the owner of the copyrights and/or the pertinent exclusive rights under copyright in the United States in motion pictures, including the motion picture *Lemony Snicket's: A Series of Unfortunate Events* (the "Copyrighted Motion Picture"), **which has been unlawfully distributed over the Internet by Davis.** (emphasis added)

5. John Davis is an individual who resides in this District at 1523 19th Street, Apt. B, Philadelphia, Pennsylvania, 19121. **Davis is also known to Paramount by the Internet Protocol ("IP") address assigned to him by his ISP on the date and time at which the infringing activity of Davis was observed (69.141.202.170 12/23/2004 04:49:52 PM (EST)). Davis' identity was confirmed through the expedited discovery this Court allowed in this case as originally filed.** (emphasis added)

At first glance it would appear that he admits as much. However, Davis later "denies using an online media distribution system to distribute to the public, including by making available to others, the Copyrighted Motion Picture. Davis denies violating Paramount's exclusive rights to reproduction and distribution." Davis further "denies being a 'first propagator' of the unauthorized distribution of the Copyrighted Motion Picture" and "denies committing the alleged foregoing acts of infringement." In short, Davis answers that he has been misidentified as the infringer of Paramount's copyright.

## D. Further Investigation

In response to Davis' denials, Paramount requested access to Davis' Macintosh G4 Cube computer in order to investigate the hard drives of his computer by a third party forensic specialist, Kroll Ontrack Electronic Evidence Services. Upon completion of its analysis, Kroll reported on August 1, 2005 that on March 25, 2005, Davis wiped his hard drive clean of all data, and then reinstalled an operating system. Paramount finds Davis' actions of wiping the hard drive clean of all data to be suspicious because it was sixteen days after Davis received notice from Comcast of the John Doe lawsuit pending against him. The effect of Davis wiping the hard drive clean of all data was to make it impossible to determine whether the motion

picture or eDonkey software was on the computer prior to March, 25, 2005. Paramount alleges that Davis' actions were intentional to prevent detection of his infringing activities. Davis denies this allegation and claims that he wiped his hard drive clean in preparation for selling it to Stephanie Seymour for $390 on March 30, 2005. Davis supports his claim with a letter to this Court by Seymour, in which she avers: (1) that she expressed an interest in buying the computer in February 2005; (2) that Davis had emailed her a picture of the computer on February 23, 2005; (3) that she was supposed to pick up the computer on March 30, 2005; (4) that she was precluded from picking up the computer because of this action; and (5) that as a result of her own financial situation did not purchase the computer until September 30, 2005.

Davis further claims that the operating system found on the computer in July 2005, MAC OS 9.2.2, is incompatible with the eDonkey network. Davis supports this claim with a printout of the eDonkey network application download page which states that eDonkey "runs on Windows, Mac OS X, and Linux." Paramount disputes this claim and alleges that while the operating system in place in July 2005 was not compatible with the eDonkey network there is no evidence of what operating system was in place at the time of the alleged infringing activity. Paramount further alleges that it is unlikely that the MAC OS 9.2.2 operating system was installed on the computer at the time of the alleged infringing activity because: (a) MAC OS 9.2.2 was last sold in late 2001, approximately four years ago, and MAC OS X was released earlier that same year; and (b) Davis is a self employed computer consultant who had worked for the government as a computer consultant. Paramount asserts that because it is unlikely for an individual with his proficiency with computers to be using an outdated operating system on his computer, I should infer from this evidence that Davis intentionally wiped the hard drive clean to prevent Paramount from detecting his infringing activities and replaced the compatible operating system with an outdated version that was incompatible with the eDonkey network.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2004). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (2004).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." *Id.* In making this determination, I must view the facts in the light most favorable to the non-moving party, and the non-moving party is entitled to all reasonable inferences drawn from those facts. *Id.* However, the nonmoving party may not rest upon the mere allegations or denials of the party's pleading. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989). If the evidence for the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Cross motions are claims by each party that it alone is entitled to summary judgment; they do not constitute an agreement that if one is denied the other is necessarily granted or that the losing party waives judicial consideration and determination of whether genuine issues of material fact exist. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). If any such issue exists it must be disposed of at trial and not on summary judgment. *Id.* In the present case, I conclude that there are five genuine issues of material fact. I will therefore deny both motions for summary judgment.

I find that the parties' disagreements as to whether Davis engaged in any infringing activity, whether he was a first propagator of the motion picture, whether he was misidentified, whether he intentionally wiped the computer's hard drive clean in order to avoid detection of his infringing activities, and whether the motion picture and the eDonkey compatible operating system were on the computer at the time of the alleged infringing activity create five genuine issues of material fact that preclude summary judgment for either party.

## DISCUSSION

To establish its claim of copyright infringement, Paramount must establish: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir.2002). With respect to the first element, Paramount asserts—and Davis does not dispute—that it holds a valid United State Copyright Registration for the motion picture and that it is

the exclusive licensee of the motion picture. With respect to the second element, "[c]opying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 17 U.S.C. § 106, including the rights to distribute and reproduce copyrighted material." *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir.2005) *quoting Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.1991) (internal quotations omitted).[2] Copying "may be demonstrated by showing that the defendant had access to the copyrighted work and that the original and allegedly infringing works share substantial similarities." *Id.*

Paramount argues that the evidence demonstrates that Davis infringed on its copyright to reproduce and distribute the motion picture, "Lemony Snicket's: A Series of Unfortunate Events." Paramount has produced evidence to show that, working on behalf of Paramount, BayTSP located at the time of the infringement (December 23, 2004 at 04:49:52 PM Eastern Standard Time) an eDonkey user with the infringing IP address (69.141.202.170) offering 100% of the motion picture for download. BayTSP identified this infringer as a first propagator because he or she was the first to offer 100% of a unique copy of the motion picture on the eDonkey network. BayTSP determined that the infringer was a Comcast subscriber because the infringer's assigned IP address was within the range of IP addresses assigned to Comcast subscribers. Comcast identified Davis as the suspected infringer because its user logs indicated that Davis was the user with the same IP address at that specific moment in time.

---

2. Section 106 of the Copyright Act provides:

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106 (2005).

In his answer, Davis denies that he infringed on Paramount's copyrights and argues in his motion for summary judgment that he has been misidentified as the infringing user. Paramount asserts that Davis offers no evidence for his contention that he was misidentified and argues that Davis cannot rely on a bare denial or unsupported allegation in his motion for summary judgment to create a genuine issue of fact. *See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* AFL–CIO, 982 F.2d 884, 892 (3d Cir.1992) ("this court has made it clear that arguments, allegations or 'facts' contained in briefs, and that are not evidentiary because they are not sworn to, are insufficient to overcome a motion for summary judgment based on sworn affidavits. Thus, the allegations raised solely in [defendant's] brief do not suffice to raise any genuine issue of material fact.") *citing Thornton v. United States,* 493 F.2d 164, 167 (3d Cir.1974) ("A statement in a brief or in oral argument does not constitute evidence" for purposes of summary judgment.). Paramount further argues that because Davis admitted in his answer that the infringing IP address was assigned to him at the date and time of the alleged infringement he cannot now deny those allegations at the summary judgment stage. *See* Fed.R.Civ.P. 8(d) (2005) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *United States v. Merritt–Chapman & Scott Corp.,* 305 F.2d 121, 123 (3d Cir.1962) ("Since the Answer fails to deny the quoted allegations in the Complaint, they are deemed admitted.").

■ However, I am guided by Rule 8(f)'s prescription that "[a]ll pleadings shall be so construed as to do substantial justice" and the principle that pro se pleadings should be construed liberally. *See Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding the allegations of a pro se complaint to a less stringent standard than formal pleadings drafted by lawyers); *Alston v. Parker,* 363 F.3d 229, 234 (3d Cir.2004); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003) ("because [plaintiff] filed his complaint *pro se,* we must liberally

construe his pleadings, and we will apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."). Upon review of Davis' answer, I find that the "admissions" in paragraphs four and five of his answer are merely a verbatim parroting of paragraphs four and five of Paramount's complaint. By contrast, in paragraphs eight through thirteen of his answer, Davis specifically denies: (a) using an online media distribution system to make the motion picture available to the public; (b) violating Paramount's exclusive rights to reproduce and distribute the motion picture; (c) being a first propagator; and (d) committing the alleged acts of infringement. Therefore, I will construe Davis' answer as a denial of Paramount's allegations that Davis engaged in the alleged acts of infringement upon its copyright of the motion picture. I will also allow Davis to assert his defense of misidentification. This defense is a logical outgrowth of his general denials: if he claims the infringer was not he, then naturally he is claiming that any infringement was done by someone else. I therefore find there to be genuine issues of material fact as to whether Davis was correctly identified as the infringer, whether he was the first propagator of the motion picture, and whether he engaged in any infringing activity.

## A. Spoliation Inference

■ Davis also argues that there is no evidence to suggest that motion picture or eDonkey network software was ever on his computer. Paramount argues that this lack of evidence does not create a genuine issue of material fact because Davis is subject to spoliation sanctions for intentionally wiping his hard drive clean of all data in order to make it impossible to determine whether the motion picture or eDonkey software was on the computer at the time of the infringing activity. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.,* 348 F.Supp.2d 332, 335 (D.N.J.2004). A showing of spoliation may give rise to a variety of sanctions: "[1] dis-

missal of a claim or granting judgment in favor of a prejudiced party; [2] suppression of evidence; [3] an adverse inference, referred to as the spoliation inference; [4] fines; [and][5] attorneys' fees and costs." *Id.*[3]

There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court. *Erie Ins. Exchange v. Applica Consumer Prods., Inc.,* No. 02–1040, 2005 WL 1165562, at *3 (May 17, 2005) *citing Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994). In exercising this discretion, however, I am guided by the following factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid,* 13 F.3d at 79. In choosing an appropriate sanction for the spoliation of evidence, courts should "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Id.; Baliotis v. McNeil,* 870 F.Supp. 1285, 1289 (M.D.Pa. 1994) ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available.") (internal citations and quotations omitted).

### 1. Degree of Fault

"When determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case." *In re Wechsler,* 121 F.Supp.2d 404, 415 (D.Del.2000); *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 334 (3d Cir.1995) ("[I]t must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for.").

Paramount argues that Davis is at fault because he willfully wiped the computer's hard drive clean of all information when he knew that the computer's memory was relevant to the litigation. *Baliotis,* 870 F.Supp. at 1290–91 ("A litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."); *Mosaid,* 348 F.Supp.2d at 336 ("While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."). I agree. Davis knew or should have known that the computer's memory was relevant to the lawsuit against him because he received notice of the action against him on March 9, 2005—sixteen days before he wiped the hard drive clean.

Davis argues that he is not at fault because he reasonably wiped the computer's hard drive clean of all prior memory in preparation for selling it to Seymour, who had expressed interest in the computer as early as February 23, 2005. This argument does not obviate his duty to preserve the computer's memory. Once he learned of the lawsuit pending against him and the subject matter of that lawsuit, he either knew or should have known that the computer's memory was a crucial piece of evidence in this action. His failure to preserve this evidence places the fault for its destruction squarely upon Davis.

---

**3.** Spoliation sanctions serve three functions:
   Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be.
   *Mosaid,* 348 F.Supp.2d at 335.

## 2. Prejudice

"When considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed." *Wechsler,* 121 F.Supp.2d at 416 ("[W]hen one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, then sanctions for spoliation are generally appropriate."). Paramount is prejudiced by the destruction of this evidence because it has not and will not have any opportunity to determine whether its motion picture or the eDonkey network software was stored on Davis' computer on the date of the alleged infringement. There are no other means of retrieving the information stored on Davis' computer prior to the time of the alleged infringement; that information is lost forever. *See id.* ("Of course, when a party is denied any opportunity to examine the evidence, this test would automatically be satisfied.").

## 3. Substantial Unfairness and Deterrence

Paramount argues that in order to avoid substantial unfairness and deter such conduct by others in the future I should impose a spoliation inference sanction against Davis for wiping his hard drive clean; Paramount asserts that this is the least onerous sanction to impose. *See Mosaid,* 348 F.Supp.2d at 335. The spoliation inference permits a fact finder to infer that the "destroyed evidence might or would have been unfavorable to the position of the offending party." *Id.* at 336 ("If a party has notice that evidence is relevant to an action, and either proceeds to destroy that evidence or allows it to be destroyed by failing to take reasonable precautions, common sense dictates that the party is more likely to have been threatened by that evidence."); *Brewer,* 72 F.3d at 334 ("When an item of evidence is relevant to an issue in a case, the trier of fact generally may receive the fact of the item's nonproduction or destruction as evidence that the party that has prevented production did so out of the well founded fear that the item of evidence would harm him or her."); *Schmid,* 13 F.3d at 78 *quoting Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir.1982) (Breyer, J.) ("the evidentiary rationale for the spoliation inference is nothing more than the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the document.").

The spoliation inference applies only where: (1) "the evidence in question was within the party's control," *Brewer,* 72 F.3d at 334; (2) "there has been an actual suppression or withholding of the evidence," *id.;* (3) "the evidence destroyed or withheld was relevant to claims or defenses," *Mosaid,* 348 F.Supp.2d at 336; and (4) "it was reasonably foreseeable that the evidence would later be discoverable," *id.* The spoliation inference sanction is appropriate in this case because, as discussed above, the information stored on the computer was within Davis' exclusive control, he destroyed that information by wiping his hard drive clean after receiving notice of this action, the information destroyed was relevant to Paramount's copyright infringement claim, and Davis knew or should have known that the information stored on his computer would later be necessary to confirm any copyright infringement or to demonstrate that he had not infringed on Paramount's copyright.

However, because neither party has requested a jury trial, Paramount argues that the typical spoliation inference jury instruction is inapplicable here. Instead, Paramount argues that I should act as the fact finder now to find as a matter of law that Davis stored the motion picture file and eDonkey network software on his computer. In other words, Paramount argues that because Davis wiped the hard drive clean of all information I should decide the motion for summary judgment by concluding from the spoliation inference that the motion picture and eDonkey network software were in fact stored on his computer at the time of the infringement.

It may be that Davis intentionally wiped the computer's memory in order to impair the ability of Paramount to discover evidence of the motion picture and eDonkey network software on his computer. However, such a factual finding is not appropriate at the summary judgment stage for three reasons. First, making such an adverse inference at this stage is tantamount to granting summary judgment—a far more severe sanction—in favor of Paramount and against Davis merely for wiping the hard drive clean. I also note that Paramount has not moved for a summary judgment sanction. *See Baliotis,* 870 F.Supp. at 1289 ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only if no alternative remedy by way of a lesser, but equally efficient sanction is available."). Second, with respect to Paramount's motion for summary judgment, I must view the evidence in the light most favorable to Davis and draw all inferences in his favor. Paramount has not cited and I cannot find any case in which a court has used the spoliation inference to determine an issue of fact in favor of granting summary judgment. Third, a spoliation inference is merely an inference that a fact finder may draw from a view of all the evidence presented at trial; it is not a legal conclusion that must be reached when evidence is presented that a party has willfully destroyed relevant evidence.

Notwithstanding the spoliation inference, there remain genuine issues of material fact as to whether the motion picture and eDonkey network software were on Davis' computer at the time of the alleged infringement and whether Davis intentionally wiped his computer hard drive clean to avoid Paramount discovering his infringing activities. Accordingly, there are three related genuine issues of material fact: whether Davis engaged in any infringing activity; whether he was a first propagator of the motion picture; and whether he was misidentified. My ruling here does not mean that Paramount will not have the benefit of the spoliation inference at trial. I will take Davis' willful destruction of evidence into consideration at the time of trial.

The genuine issues of material fact discussed above also preclude Davis' motion for summary judgment. The parties' cross motions for summary judgment will be denied. An appropriate order follows.

### ORDER

AND NOW, this 2nd day of December, upon consideration of the parties' cross motions for summary judgment and for the reasons set forth in the accompanying memorandum, it is ORDERED that the parties' cross motions for summary judgment are DENIED. I recommend that defendant seek legal representation.